# Illinois Official Reports

## Appellate Court

---

### *People v. Ramirez-Lucas*, 2017 IL App (2d) 150156

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID RAMIREZ-LUCAS, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-0156 |
| Filed | August 8, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 07-CF-4698; the Hon. Fernando L. Engelsma, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Michael J. Pelletier, Thomas A. Lilien, Alan D. Goldberg, and Aliza R. Kaliski, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Joseph P. Bruscato, State's Attorney, of Rockford (Patrick Delfino, Lawrence M. Bauer, and Victoria E. Jozef, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Justices Jorgensen and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1 Following a jury trial, the defendant, David Ramirez-Lucas, was convicted of first degree felony murder in connection with the deaths of two men at a Rockford bar. He was sentenced to natural life imprisonment. On direct appeal, this court affirmed those convictions and the sentence. See *People v. Ramirez-Lucas*, 2013 IL App (2d) 110940-U. The defendant thereafter filed a postconviction petition, arguing that his trial counsel was ineffective for failing to investigate and present three occurrence witnesses whose testimony would have corroborated his self-defense theory. The trial court dismissed the defendant's petition as frivolous and patently without merit. We reverse and remand for additional proceedings.

¶ 2                                   BACKGROUND

¶ 3 We previously summarized the relevant facts in our resolution of the defendant's direct appeal (see *id.*), and we restate the pertinent facts here.

¶ 4 On December 19, 2007, the State charged the defendant with the knowing and felony murders (720 ILCS 5/9-1(a)(2), (a)(3) (West 2006)) of Tomas Mora and Heriberto Mendez. The defendant was charged with aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2006)) as to Jesus Medrano, Leonardo Medrano, and Jose Ibarra. He was charged with aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2006)) as to Cristiano Ramirez.

¶ 5 Between May 3 and May 10, 2010, the trial court conducted a jury trial on the charges against the defendant. The evidence presented indicated that on the evening of December 8, 2007, the defendant went to the El Tenampa bar on South Main Street in Rockford. El Tenampa was celebrating its fifth anniversary in business, and had a band playing in addition to various special events such as a raffle and giveaways of promotional items. The defendant arrived between 7:30 and 8 p.m. and sat at a table near the restrooms. The bar was U-shaped, with the back door to the parking lot at the southwest end of the U. The defendant was sitting in the northwest corner. The defendant drank at least 10 beers, ordering 3 or 4 "buckets" of beer (buckets filled with ice and bottles of beer). The bar was crowded, primarily with family and friends of the owner, Jesus Medrano, Sr. Witnesses estimated that there were between 40 and 60 people there.

¶ 6 Sometime between 11 p.m. and midnight, the defendant went to the restroom. There he encountered Jesus Medrano, Jr., and the two got into an altercation when (according to Medrano, Jr., and his friend Hugo Garza) the defendant made a comment about urinating in the bathroom sink. Garza joined in and began fighting with the defendant, hitting him seven or eight times. A few minutes later, Medrano, Sr., broke up the fight and told the defendant he had to leave. At that point, the defendant's nose was bloody, as was his shirt. Garza's shirt also had blood on the sleeve, and he changed it later while still at the bar. Various witnesses testified that the defendant left El Tenampa peacefully (accompanied to the door by Medrano, Sr.), although the defendant testified that he was angry.

¶ 7 A friend gave the defendant a ride to his home, which was about 10 minutes away. The defendant did not have his keys, so he used a hidden key to enter his home. (The defendant originally testified that when he got home, he looked for his keys and realized at that point he did not have them. However, the defendant later testified that he realized as he was being

ejected from El Tenampa that he did not have his keys or cell phone and that he asked Medrano, Sr., to get those items for him, but Medrano, Sr., merely repeated that the defendant had to leave.) At his home, the defendant went to the bathroom, washed his face, and changed his clothes. He then decided to go back to El Tenampa to get his phone and keys. He took with him a fully-loaded .45-caliber semi-automatic handgun. The same friend who had given him a ride home gave him a ride back to El Tenampa.

¶ 8                      The Shooting of Leonardo Medrano

¶ 9     The defendant arrived back at El Tenampa about 30 to 45 minutes after he had been ejected, and entered by the back door (the door most commonly used by patrons). Immediately inside the back door was a short hallway with two side doors, one leading to the area where drinks were served and one to the kitchen. Beyond that was the main room of El Tenampa. The defendant testified that he had his gun in the pocket of his jacket, with the handle sticking out a little bit. He walked into the main room and toward the area where he had been sitting earlier. According to the defendant, when he was a short distance away from the table where he had been sitting, he saw that his keys and phone were not on the table and turned around to leave. Without warning he was then grabbed from behind. He took his gun out of his pocket and fired a shot into the floor. He fired into the floor because he did not want to hurt the man who had grabbed him.

¶ 10    Various witnesses had differing accounts of the events that occurred immediately after the defendant returned to the bar. Nicole Beard, a waitress at El Tenampa, testified that she was in front of a closet near the back door when the defendant came in. He walked past her, and then he bumped into someone else and his coat flew open. At that point, people started screaming in Spanish. (Beard did not understand Spanish.) The defendant kept walking toward the crowd, and the crowd came toward him. The defendant then raised his hand above the crowd. He was holding a gun and started shooting in the air toward the crowd. Beard heard two to four shots as she left.

¶ 11    Medrano, Sr., testified that he did not notice that the defendant had come into the bar until someone yelled, "He has a gun!" The defendant was standing near the dartboard (near the restrooms) when Medrano, Sr., heard the first shot. After the first shot, the defendant began walking back toward the exit. Leonardo Medrano (one of the owner's sons) came up to the defendant and tried to take his gun away. Leonardo fell back and the defendant shot him in the leg. Leonardo's sister, Nidya Angeles, covered Leonardo with her body, and the defendant kicked at Leonardo's face. Medrano, Sr., hit the bar's "panic button" to call the police.

¶ 12    Angeles testified that she, Leonardo, and some others were at a table between the pool table and the restrooms. She saw the defendant escorted out. Later, she heard someone yell, "he has a gun!" The defendant was near the dartboard then. She saw the defendant pointing the gun, then shooting. Leonardo was near her and the defendant pointed the gun at him. She pulled Leonardo backward, and he fell. Angeles then covered him with her body. Angeles did not recall the defendant shooting Leonardo. However, as she and Leonardo were lying on the floor, she "felt kicking."

¶ 13    Leonardo testified that he had followed his father as the defendant was escorted out after the restroom fight. When the defendant returned about 30 minutes later, Leonardo saw him. He approached the defendant and asked "what are you doing?" because the defendant had a

gun in his hand. Leonardo described the defendant as holding the gun with his elbow bent and the gun pointed upward at a 45-degree angle. As the defendant walked toward the dartboard, he straightened his arm and began sweeping the gun back and forth in a panning motion. Leonardo tried to grab the gun from the defendant, but the defendant pulled away and shot once. The shot was toward Leonardo but missed him. Leonardo tried again to grab the gun. The defendant pushed him and then shot him in the leg as he fell backward. Angeles jumped on top of Leonardo and covered him, screaming at the defendant to leave him alone. The defendant then kicked Leonardo in the mouth.

¶ 14    Antonio Ramirez testified that he was at El Tenampa with his brother Christiano. He was sitting near the front door and the pool table, near the east end of the room. He saw the defendant escorted out after the restroom fight. About half an hour later, he saw the defendant run in, screaming "where is he, where is he?" and scanning the bar. (This is contrary to the testimony of most of the witnesses, who stated that the defendant did not say anything while he was moving through the bar.) Christiano pointed the defendant out to Antonio. Antonio saw the defendant holding the gun straight out in front of him and sweeping it back and forth toward people in a horizontal panning motion. Antonio saw Leonardo approach the defendant and try to calm him down. The defendant got mad and pushed Leonardo, who fell backward. The defendant then shot toward Leonardo. Antonio and Christiano heard a second shot, and people began screaming and running.

¶ 15                    The Confrontation With Christiano Ramirez

¶ 16    Antonio and Christiano turned to go, but were blocked by other people. The defendant began approaching them. Christiano, who was holding a bottle of beer, stepped in front of Antonio. Christiano testified that the defendant approached until the gun was within a foot of Christiano's chest. Both Christiano and Antonio testified that the defendant pointed the gun at them. The defendant said something to Christiano in Spanish that he did not understand; according to Antonio, the man wanted Christiano to drop the bottle. The defendant testified that, as he was heading for the door, Christiano was in front of him holding a beer bottle. The defendant was afraid that Christiano would hit him with the bottle, and so the defendant told him to drop the bottle. On cross-examination, the defendant agreed that Christiano had not threatened him before the defendant pointed his gun at Christiano and told him to drop the bottle. Antonio testified that the defendant then "let out a shot toward us." Antonio confirmed that he told police that night that the defendant "shot the gun at our feet" and that he felt "the bullet hit near the floor." Christiano did not recall the defendant firing. In his statement to police later that night, he said that the defendant fired a shot into the floor between Christiano's legs, but he said this based on seeing a bullet hole in the floor when he showed the police where the confrontation occurred. The defendant confirmed that he fired a shot during the confrontation with the Ramirez brothers, "so that [Christiano] would drop the bottle." However, he stated that he fired at the floor, not at Christiano.

¶ 17                            The Shooting of Mora

¶ 18    The defendant testified that he continued toward the back door, but Tomas Mora approached him and hit him twice on the back with a bar stool. Most of the other patrons who testified at the trial agreed that Mora had lifted a bar stool and swung it down toward the defendant. Medrano, Sr., who was in the service area at the time, stated that Mora missed his

step as he was doing this and fell. The defendant shot Mora in the chest. Mora fell on the floor, near the dance floor. The defendant conceded that, at the time Mora attacked him, he had already fired two shots.

¶ 19    Medrano, Sr., stated that, after the defendant shot Mora, Medrano, Sr., began to shout "bad words" at the defendant. The defendant came toward Medrano, Sr., pointing his gun at him, and Medrano, Sr., dropped to the floor.

¶ 20                                  The Shooting of Ibarra

¶ 21    José Ibarra testified that he had arrived at El Tenampa at about midnight, as the defendant was being ejected. Ibarra was near the pool table 30 to 45 minutes later when he saw the defendant come back with a gun. As the defendant began shooting, Ibarra moved around the pool table. Ibarra saw the defendant shoot Mora, Ibarra's cousin. Ibarra went to help Mora. Ibarra then saw the defendant going toward Ibarra's sister. Ibarra hit the defendant with a pool cue and tried to grab his gun hand. As they were struggling, the defendant shot Ibarra in the abdomen. Ibarra testified that he spent two weeks in the hospital as a result. As to this shooting, the defendant testified that, after he shot Mora, someone hit him with a stick, people jumped on him, and he shot again, but he did not see where that shot went.

¶ 22                                  Events in the Kitchen

¶ 23    Leonardo testified that, after the defendant shot him in the leg and kicked him, he got up in time to see the defendant shoot Mora. Leonardo hid behind the bar, but then saw the defendant aim a gun at his father. Leonardo came out from behind the bar and approached the defendant, grabbing him around the chest and trying to pin his arms downward. Leonardo's cousin Heriberto Mendez (Ibarra's nephew) came to help, and they wrestled the defendant into the kitchen. The lights were off in the kitchen. The defendant testified that he was trying to leave El Tenampa but people were hitting him and he was thrown into a dark room. Medrano, Sr., also came out from behind the bar to assist Leonardo and Mendez at this point.

¶ 24    The four men scuffled in the dark kitchen. Medrano, Sr., testified that the men were standing at first but then fell and continued fighting on the floor. They were yelling at the defendant to drop the gun, but he would not, so they continued to fight with him to try to get the gun away from him. The defendant fired the gun "a lot of times." At some point, Mendez was shot in the head and died. Leonardo was shot in the foot. Medrano, Sr., was shot through the shoulder; the bullet also grazed his neck and chin. Medrano, Sr., Leonardo, and the defendant all agreed that the gun remained in the defendant's hand throughout the fighting. The defendant testified that he did not intend to pull the trigger or shoot anyone while he was in the kitchen. Agreeing with a question from his attorney, the defendant stated that the gun might have gone off when people in the kitchen pulled on the gun while his finger was on the trigger. Medrano, Sr., stated that no one could get the gun away from the defendant until all of the bullets were gone. Leonardo testified that he eventually bit the defendant on the hand to make him let go of the gun. The defendant testified that, because he was afraid, he held on to the gun tightly until he lost consciousness from the blows being showered on him.

¶ 25                                    The Aftermath

¶ 26      When the police arrived (in response to several calls to 911), they found a small crowd in the kitchen, beating the defendant, who was unconscious. The defendant, Leonardo, Ibarra, Mora, and Medrano, Sr., were all taken to the hospital. The defendant had cuts on his face and scalp and his nose was broken. Leonardo had been shot twice, once in the left shin and once in the left foot. Ibarra had been shot through the abdomen. Mora, who had been shot in the chest, was pronounced dead at the hospital. Medrano, Sr., was shot through the shoulder. Mendez's body was taken directly to the coroner's office.

¶ 27      Police crime-scene investigators found eight spent .45-caliber shell casings in El Tenampa: four in the main room and four in the kitchen. The .45-caliber handgun recovered from the scene had a magazine that could hold eight bullets, but it was empty. A second magazine, fully loaded with .45-caliber bullets, was also found at the scene, but no evidence linked it to the defendant.

¶ 28                              The Verdicts and the Sentence

¶ 29      On May 13, 2010, the jury returned its verdicts. As to the charges of knowing murder, the jury found the defendant guilty of second degree murder as to Mora and involuntary manslaughter as to Mendez. The jury also found the defendant guilty of the first degree felony murders of both Mora and Mendez, based on two predicate felonies that the jury found the defendant had committed: (1) the aggravated battery of Ibarra and (2) the aggravated discharge of a firearm toward Christiano. The jury also returned a guilty verdict on the misdemeanor charge of reckless conduct toward Medrano, Sr. The jury returned verdicts of not guilty on all of the remaining charges, including the charge of aggravated battery of Leonardo. Finally, the jury found that the State proved that the defendant personally fired the shot that killed Mora but did not prove that the defendant personally fired the shot that killed Mendez.

¶ 30      Following the denial of his motion for a new trial, the trial court sentenced the defendant to natural life imprisonment for the felony murders of Mora and Mendez. The defendant thereafter filed a timely notice of appeal.

¶ 31                                   The Direct Appeal

¶ 32      On appeal, this court vacated two of the defendant's four murder convictions based on one-act, one-crime principles. Specifically, this court vacated the felony-murder convictions based on the aggravated battery of Ibarra, leaving the felony-murder convictions based on the aggravated discharge of a firearm toward Christiano. We affirmed his sentence of natural life imprisonment. *People v. Ramirez-Lucas*, 2013 IL App (2d) 110940-U, ¶¶ 27, 65.

¶ 33                              The Postconviction Petition

¶ 34      On June 18, 2014, the defendant filed a postconviction petition. The petition alleged that trial counsel failed to investigate and call witnesses who were at the bar and would have testified that the defendant was not the aggressor but acted in self-defense. In support of his petition, the defendant attached the affidavits of Erasmo Soto, Jose Luis Ildefonso, and Manuel Tello. The men testified that, when the defendant returned to the bar, someone grabbed him from behind. The defendant pulled out a gun and yelled "Don't touch me!" as a

couple of men approached him. He then shot at the floor. At that point, people began yelling and started heading toward the door. The defendant appeared scared and began to leave, but someone blocked him while holding a bottle in his hand. That man pushed the defendant and threw the bottle toward him, and the defendant fired one more shot at the floor.

¶ 35    The three witnesses further testified that the defendant was going toward the exit when someone hit him in the back, and then someone hit him in the head with a pool cue when he turned around. The defendant tried to get away, but a group of men jumped him and took him toward the kitchen. The witnesses heard yelling and more shots. When the police and ambulance arrived, the witnesses left the crowd. They explained that they did not talk to the police because they did not want to be involved. However, they now wanted to assist the defendant with his case.

¶ 36    The defendant attached his own affidavit. He stated that the man with the beer bottle pushed him and that a bottle was thrown near him, causing him to react. The defendant further stated that he told his attorney that many people in the bar could support his self-defense theory.

¶ 37    On September 11, 2014, the trial court dismissed the defendant's petition as frivolous and patently without merit. The trial court explained that the defendant's allegations were conclusory and involved matters of trial strategy. The trial court also found that the three identical affidavits would have been cumulative of the other evidence presented at trial or constituted "nothing more than opinion evidence." Following the denial of his motion to reconsider, the defendant filed a timely notice of appeal.

¶ 38                                              ANALYSIS

¶ 39    On appeal, the defendant argues that the trial court erred in summarily dismissing his petition. Specifically, the defendant contends that his petition set forth a potentially meritorious claim of ineffective assistance of counsel, due to trial counsel's failure to investigate and present the three occurrence witnesses whose testimony would have corroborated his self-defense theory and would have undercut the State's case for aggravated discharge of a firearm toward Christiano.

¶ 40    The Post-Conviction Hearing Act (the Act) (725 ILCS 5/122-1 (West 2014)) provides a remedy to criminal defendants who have had substantial violations of their constitutional rights during their criminal trials. See *People v. Vernon*, 276 Ill. App. 3d 386, 391 (1995). A postconviction proceeding is not an appeal *per se*, but a collateral attack upon a final judgment. See *People v. Lester*, 261 Ill. App. 3d 1075, 1077 (1994). A *pro se* petitioner is entitled to an evidentiary hearing on his postconviction petition only when he presents the "gist" of a meritorious constitutional claim (*People v. Porter*, 122 Ill. 2d 64, 74 (1988)) and the record or accompanying affidavits support the allegations in the petition (*Vernon*, 276 Ill. App. 3d at 391). The "gist" standard represents a "low threshold," and during the summary dismissal stage the allegations in the petition must be taken as true and liberally construed. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). A petition may be summarily dismissed as frivolous or patently without merit only if it has no arguable basis in either law or fact. *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). Whether the allegations in the petition are sufficient to avert summary dismissal is a legal inquiry, subject to *de novo* review. *People v. Coleman*, 183 Ill. 2d 366, 388 (1998).

¶ 41    As the defendant's claim alleges the ineffective assistance of counsel, the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), apply. *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To succeed on such a claim, a defendant must show both that his counsel's performance "fell below an objective standard of reasonableness" (*Strickland*, 466 U.S. at 688) and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*id.* at 694). To satisfy the first portion of the *Strickland* test, a defendant must show that counsel's performance fell below an objective standard as measured by prevailing professional norms. *People v. Spann*, 332 Ill. App. 3d 425, 430 (2002). There is a strong presumption, which a defendant must overcome, that counsel's performance "falls within the wide range of reasonable professional assistance." *People v. Miller*, 346 Ill. App. 3d 972, 982 (2004). Decisions involving judgment, strategy, or trial tactics will not support a claim of ineffective assistance. *People v. Lindsey*, 324 Ill. App. 3d 193, 197 (2001). At the first stage of postconviction proceedings, a petition alleging ineffective assistance may not be summarily dismissed if it is arguable that counsel's performance fell below an objective standard of reasonableness and it is arguable that the defendant was prejudiced. *People v. Wright*, 2013 IL App (4th) 110822, ¶ 22.

¶ 42    A defense attorney's basic function is to "make the adversarial testing process work in the particular case." (Internal quotation marks omitted.) *People v. Domagala*, 2013 IL 113688, ¶ 38. As a result, attorneys have an obligation to "explore all readily available sources of evidence that might benefit their clients." *People v. Morris*, 335 Ill. App. 3d 70, 79 (2002). The failure to develop an available defense and present available witnesses to support that defense thus amounts to ineffective assistance of counsel. *Id.* Further, an attorney is ineffective when he fails to present evidence of which he is aware to support an otherwise uncorroborated defense. *People v. King*, 316 Ill. App. 3d 901, 913 (2000); *People v. Skinner*, 220 Ill. App. 3d 479, 485 (1991). Moreover, an attorney who fails to fully investigate cannot make a sound strategic decision about whom to call. *People v. Truly*, 230 Ill. App. 3d 948, 954 (1992); *Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012) (explaining that defense counsel who never found out what potential witnesses' testimony would be "could not possibly have made a reasonable professional judgment that their testimony would have been cumulative or bolstered the State's case and could not have chosen not to call [them] as a matter of strategy").

¶ 43    We find this case to be analogous to *Hodges*, 234 Ill. 2d 1. In that case, the defendant testified that he acted in self-defense when he shot and killed a man at a gas station. *Id.* at 4-5. After his conviction was affirmed on direct appeal, he filed a postconviction petition alleging that trial counsel was ineffective for failing to investigate and present testimony from three witnesses who would have supported his self-defense theory. *Id.* at 6-8. On appeal, the supreme court held that the defendant had presented an arguable claim of counsel's ineffectiveness for failing to investigate and present those witnesses. In so ruling, the supreme court found that the defendant "identified each of the three witnesses and summarized the testimony they would give" and that he satisfied the corroboration requirement by providing signed affidavits from those three witnesses. *Id.* at 18. The supreme court further found that none of the allegations about those witnesses "could be described as fantastic or delusional" and that the defendant's legal theory was not meritless, as it supported his unreasonable belief in the need for self-defense. *Id.* at 19-22.

¶ 44    Here, as in *Hodges*, the defendant argued that he acted in self-defense when he shot at Christiano. The defendant's claim was uncorroborated at trial. As in *Hodges*, the defendant in his postconviction petition identified three witnesses who would have corroborated his theory. He supported his petition with the affidavits of those witnesses. Moreover, as in *Hodges*, the defendant argued that his trial counsel was ineffective for failing to investigate and present testimony from those witnesses. As the supreme court held in *Hodges* that the defendant's petition raised an arguable claim of counsel's ineffectiveness, we determine here that the defendant raised an arguable claim that he received ineffective assistance of counsel.

¶ 45    The State insists that *Hodges* is distinguishable because in that case defense counsel could have easily discovered the three witnesses at issue. Two of those witnesses were friends of the victim's and had arrived with the victim at the scene. The third witness was, according to the defendant's postconviction petition, someone the defendant had told counsel about prior to trial. By contrast, the State notes, the defendant here did not tell counsel about any of the three witnesses prior to trial. Those witnesses did not speak with the police. Moreover, none of the witnesses in their affidavits indicated that anyone else at the bar knew they were there that night. As such, the State insists that counsel could not have known about those witnesses.

¶ 46    The record reveals that there were approximately 50 people at the bar the night of the shooting. The defendant told defense counsel that there were many people in the bar who could support his claim of being attacked or grabbed before any shots were fired. The defendant claimed that, despite his informing defense counsel of this, counsel did not investigate whether any such witnesses actually existed. This is consistent with the affidavits of Ildefonso, Tello, and Soto, who testified that they came forward only after hearing of the defendant's conviction from the news. As almost all of the people at the bar on the night of the shooting were members of the Medrano family or friends of the family, it is at least *arguable* that defense counsel would have learned the names of Ildefonso, Tello, and Soto had he asked the known witnesses to identify everyone at the bar that night. See *id.* at 11-12; *Wright*, 2013 IL App (4th) 110822, ¶ 22. Although the identities of the witnesses at issue were more readily apparent in *Hodges* than in the present case, we hold that the defendant has presented enough evidence here to move the case to second-stage proceedings. See *Wright*, 2013 IL App (4th) 110822, ¶ 22 ("A trial court should not summarily dismiss a postconviction petition unless its lack of legal and factual merit is certain and indisputable.").

¶ 47    In so ruling, we reject the State's argument that the defendant was not arguably prejudiced by defense counsel's representation because the proposed testimony would have been cumulative of the defendant's testimony regarding his entry into the bar and the firing of the first gunshot. The defendant testified that, after he was grabbed by Leonardo from behind and after he tried to leave the bar, he shot at Christiano's feet in self-defense. The defendant explained that he feared that Christiano, who had already pushed him and was blocking the exit, would hit him with a bottle.

¶ 48    In their affidavits, the three witnesses explained that, after the defendant was grabbed from behind after he returned to the bar, the defendant pulled out a gun and yelled, "Don't touch me!" as men approached him, after which he shot at the floor. The defendant then tried to leave, but was blocked by a man holding a bottle. After that man pushed the defendant and threw the bottle at him, the defendant fired one more shot at the floor. Although the defendant headed toward the exit, someone hit him in the back, and someone hit him in the

head with a pool cue when he turned around. The defendant tried to get away, but a group of men jumped him and took him toward the kitchen.

¶ 49 Evidence is considered cumulative when it adds nothing to what was already before the jury. *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009); *People v. Gabriel*, 398 Ill. App. 3d 332, 351 (2010). However, evidence is not considered cumulative if it goes to an ultimate issue in the case. *People v. Molstad*, 101 Ill. 2d 128, 135 (1984).

¶ 50 The testimony at issue here, which would have corroborated the defendant's otherwise uncorroborated defense, would not have been merely cumulative of the defendant's testimony because the witnesses would have provided more details as to what happened at the bar that night than the defendant had. Specifically, the witnesses stated that the defendant (1) yelled, "Don't touch me," (2) shot at the floor in response to being pushed and having a bottle thrown at him, (3) was hit in the head with a pool cue, and (4) tried to get away but a group of men jumped him and took him toward the kitchen. Furthermore, the evidence is not cumulative because it goes to an ultimate issue of whether the defendant acted in self-defense when he shot at Christiano. See *id.*

¶ 51 In urging us to reach a different result, the State points to *People v. Harmon*, 2013 IL App (2d) 120439. In that case, the defendant was convicted of aggravated kidnapping and arson. *Id.* ¶ 17. The victim testified that the defendant sustained a hand injury after punching him. *Id.* ¶ 6. The defendant, however, testified that he injured his hand the day before the crime, when he was helping his aunt move. *Id.* ¶ 13. The defendant denied any involvement in the crime. *Id.* ¶ 14. In his postconviction petition, the defendant argued that his counsel was ineffective for not calling Willie Gulley as a witness. *Id.* ¶ 27. The defendant claimed that Gulley would have testified that the defendant hurt his hand helping his aunt move. *Id.* However, the defendant did not indicate if Gulley knew when the defendant had helped his aunt move. *Id.* This court held that the defendant did not present an arguable claim of counsel's ineffectiveness because "Gulley was not even certain when defendant's injury occurred" and because Gulley's testimony would have been cumulative of the defendant's testimony about the hand injury. *Id.* ¶ 33.

¶ 52 The State's reliance on *Harmon* is misplaced because in that case, (1) Gulley could not corroborate the defendant's alibi and (2) Gulley's testimony would not have added any information for the jury to consider. As explained above, the three witnesses' testimony here would have corroborated the defendant's defense and would have provided additional information for the jury to consider.

¶ 53 The State further argues that the defendant was not arguably prejudiced by defense counsel's failure to call the three witnesses because their proposed testimony would have contradicted the defendant's testimony. The State notes that the witnesses indicated that Christiano blocked, pushed, and threw a bottle at the defendant before the defendant fired the gun. This differed from the defendant's testimony that Christiano was standing in his way, held a bottle, and did not drop the bottle until the defendant fired the gun the second time. The defendant also denied that Christiano threatened him before he pointed the gun at a bar patron. Because the three witnesses would have contradicted the defendant's testimony, the State insists that defense counsel's failure to discover those witnesses does not constitute ineffective assistance of counsel.

¶ 54 In response, the defendant acknowledges that there were some contradictions between his testimony and the testimony of the three witnesses. However, the defendant insists that such

discrepancies can be easily explained because the scene was chaotic when the shooting occurred. The defendant argues that the chaos created numerous inconsistencies in the evidence, such as whether (1) Mora was shot before the encounter between the defendant and Leonardo, (2) Mora held a bar stool during his confrontation with the defendant, and (3) the defendant shot at the feet of Christiano and Antonio. The defendant further asserts that inconsistencies between the three witnesses' testimony and his own are understandable in light of the fact that he was drinking heavily and also beaten and seriously injured during the night in question.

¶ 55     We agree with the defendant that the inconsistencies between his testimony and that of the three witnesses were not a basis to dismiss his petition. In *Domagala*, 2013 IL 113688, the defendant's postconviction petition included a new physician's expert opinion that contradicted the opinion given by a different physician at trial. The supreme court found that the conflicting opinions did not bar the defendant from receiving relief, explaining that resolving evidentiary conflicts was inappropriate at the first stage of postconviction proceedings. *Id.* ¶ 46. Rather, "[s]uch conflicts are only appropriately resolved at the third stage, where the circuit court can weigh credibility and determine the weight to be given [to] testimony and evidence." *Id.*

¶ 56     Here, as in *Domagala*, we do not believe that it is proper to resolve inconsistencies in witness testimony at the first stage of postconviction proceedings. Instead, this is a matter for the trial court to resolve at a later stage of the proceedings. See *id.*

¶ 57                                          CONCLUSION

¶ 58     We reverse the circuit court of Winnebago County's summary dismissal of the defendant's petition for postconviction relief as frivolous and patently without merit. The cause is remanded to the circuit court with directions that the defendant's request for the appointment of new counsel be granted and the matter be advanced to the second stage of postconviction proceedings.

¶ 59     Reversed and remanded with directions.