2024 IL App (1st) 200620-U

FIRST DIVISION
September 16, 2024

No. 1-20-0620

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| | ) | Cook County, Criminal |
| v. | ) | Division. |
| | ) | |
| ARTEZ THIGPEN, | ) | No. 04 CR 2814 |
| | ) | |
| Petitioner-Appellant. | ) | Honorable |
| | ) | James B. Linn, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

**O R D E R**

¶ 1    *Held*:    The circuit court's second-stage dismissal of the petitioner's *pro se* petition is affirmed in part and reversed in part. The petitioner made a substantial showing of actual innocence and ineffective assistance of counsel for counsel's failure to investigate, call exculpatory witnesses, and impeach the lead investigating police detective with evidence regarding his pattern and practice of misconduct. The circuit court properly dismissed the petitioner's remaining claims.

¶ 2     After a jury trial in the circuit court of Cook County, the petitioner, Artez Thigpen, was convicted of two counts of first-degree murder and sentenced to natural life imprisonment. The petitioner now appeals from the second-stage dismissal of his *pro se* petition filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). He first contends that we must reverse the dismissal of his petition because the circuit court utilized an improper standard of review and made credibility determinations, which are not permitted at the second stage of postconviction proceedings. In addition, he contends that his petition should have been advanced to the third stage of postconviction proceedings because, taken as true, his pleadings made a substantial showing of ineffective assistance of both his trial and appellate counsels, numerous trial errors, and a freestanding claim of actual innocence. For the following reasons, we affirm in part and reverse in part.

¶ 3                                 I. BACKGROUND

¶ 4     Because the record before us is voluminous, as it spans over two decades, we set forth only those facts and procedural history relevant to the resolution of this appeal. The instant matter arises from the September 13, 1993, gang-related kidnapping and murder of two victims, 15-year-old Stanton Burch and 18-year-old Michael Purham. In 1993, four codefendants Derrick Harvey, Hulon Verser, Fred Weatherspoon and Antonio House were arrested and charged for their involvement in these murders. Codefendants Verser and Weatherspoon were convicted of the two murders, while codefendant Harvey was acquitted of the murders but found guilty of kidnapping. After the conclusion of the codefendants' trials and five years after the incident occurred, in July 1998, the State charged the petitioner[1] with, *inter alia*, two counts of first-degree murder for his

---

[1] The record reveals that the petitioner was 21 years old in September 1993.

involvement in the crime.[2]

¶ 5     The petitioner was subsequently tried twice. His first jury trial was held on January 26, 2004, after which he was found guilty of both murders. A month after his conviction, however, the United States Supreme Court released its decision in *Crawford v. Washington*, 541 U.S. 36 (2004), and the petitioner filed a motion arguing that his conviction was invalid. Upon agreement from both parties, the circuit court ordered that the petitioner be granted a new trial.

¶ 6     The petitioner's second jury trial was held in February 2005, and the following relevant evidence was adduced. The State's theory of the case was that the two victims were kidnapped and shot by a group of Unknown Vice Lord gang members, led by the petitioner, as part of an intra-gang dispute over the control of drug sales at a certain intersection on the west side of Chicago.

¶ 7     Chicago Police Commander Micheal Cronin, who was an expert in gang intelligence, testified that in 1993 the area near Springfield Avenue and Fillmore Street in Chicago was controlled by the Unknown Vice Lords, whose leader was Willie Lloyd, and who sold crack cocaine there. According to Commander Cronin, in 1993 there was a war within the Unknown Vice Lords, with one faction loyal to Lloyd and another loyal to Tyrone Williams, otherwise known as Baby Ty, with the faction led by Ty having attempted to kill Lloyd twice.

¶ 8     Chicago Police Sergeant Robert Schaefer next testified that on September 14, 1993, he was among a group of police officers conducting surveillance at a gang funeral. After receiving a dispatch that a group of gang members were approaching two vehicles near the funeral, Sergeant Schaefer began walking towards one of the vehicles. As he did so, the passenger door of the vehicle opened and he observed codefendant Harvey sitting in the passenger seat, holding "a large blue

---

[2]The petitioner was indicted a second time on January 26, 2004, because the State realized that it had used the wrong date for the commission of the crimes in its 1998 grand jury indictment, and therefore convened a second grand jury hearing to correct that error. Chicago Police Detective Kriston Kato testified at both grand jury hearings.

steel shotgun" commonly referred to as "a street sweeper." Sergeant Schafer drew his gun and ordered codefendant Harvey to drop the weapon and exit the car. Harvey and the other occupants of the vehicle fled, but Sergent Schafer caught Harvey, handcuffed him, brought him back to the car and recovered the shotgun with "six live shotgun rounds." He identified the shotgun at trial and claimed that it was capable of firing what is known as a "deer slug" bullet. Even though Sergeant Schafer testified that he sent the shotgun for fingerprint and ballistic analysis, no forensic, fingerprint or ballistic evidence was presented at trial linking the shotgun to the petitioner or anyone else involved in the commission of the crime.

¶ 9     Instead, the State's case consisted of the testimony of three eyewitnesses, two of whom recanted at trial.

¶ 10    Codefendant Harvey, who was serving a 30-year sentence for kidnapping in the instant case,[3] acknowledged that he was an Unknown Vice Lord in 1993. He testified that he was familiar with the petitioner from the neighborhood but did not know him personally and did not know whether the petitioner was a member of the same gang.[4] Harvey acknowledged that he was near Springfield and Fillmore on September 13, 1993, but denied making statements that inculpated either him or the petitioner in the shootings that occurred that day.

¶ 11    Codefendant Harvey testified that he was arrested the night after the shooting, while returning from a funeral. He claimed that he observed the police pull a shotgun out of a car that was parked nearby. Harvey averred that he was never inside that car, never possessed the shotgun,

---

[3] As noted above, codefendant Harvey was charged with two counts of first-degree murder but was acquitted of those charges and found guilty only of kidnapping.

[4] The parties subsequently stipulated that Harvey had previously testified that he was selling drugs for the petitioner at Springfield and Fillmore, that the petitioner was an Unknown Vice Lord, that they had grown up in the same neighborhood and that the petitioner's grandmother lived nearby.

and never told the police that the shotgun was used to shoot one of the victims in this case. Instead, Harvey claimed that once he was brought to the police station, he was placed in an interview room where he was interrogated by Detective Kriston Kato, who was the lead investigator on the case. Detective Kato told Harvey that the police had recovered two bodies and needed a witness, and that if Harvey agreed to go along with the detective's story, he would be released. Detective Kato struck Harvey in the face and threatened to put his family's names and addresses in the newspaper if he refused. He then told Harvey to just go along with whatever the detective said after the Assistant State's Attorney (ASA) entered the room. In addition, he instructed Harvey to tell the ASA that the detectives did not offer or threaten him with anything.

¶ 12    Codefendant Harvey acknowledged that when he subsequently met with the ASA, the ASA asked him basic questions about his education and whereabouts, after which he got multiple papers from Detective Kato and told Harvey to sign them. Harvey signed the papers without reading them because he just wanted to get out of the police station. He disavowed all the inculpatory information contained therein and denied having led the police to the victims' bodies.

¶ 13    Codefendant Harvey also acknowledged that he received a ten-year sentence for refusing to testify at the petitioner's original trial and that in exchange for his present testimony the State offered him immunity and agreed to ask the circuit court to purge that sentence.

¶ 14    After codefendant Harvey's testimony, ASA James Nelson testified that he took Harvey's statement at about 5:40 a.m., on September 15, 1993. He acknowledged that he was in the interview room alone with Harvey for only about one minute. Detective Kato was also present in the room for the remainder of the time. ASA Nelson acknowledged that he did not ask Harvey whether the police allowed him to sleep. He testified, however, that after he read Harvey his *Miranda* rights, Harvey agreed to give a written statement.

¶ 15    That statement was a handwritten summary of Harvey's account written by ASA Nelson and signed by Harvey. It was published to the jury and included the following relevant information. Harvey, who was 18-years old at the time told the police that he had been a member of the Unknown Vice Lords for approximately four years and mainly sold drugs for them. The petitioner was Harvey's immediate superior and ran an exclusive drug spot on the corner of Springfield and Fillmore. According to Harvey, Lloyd was the head of the Unknown Vice Lords but there was an internal struggle to determine whether he would remain "head boss."

¶ 16    On September 12, 1993, Harvey got a telephone call from the petitioner to come to Springfield and Fillmore. Once there, he was joined by about ten other gang members, one of whom, named "Larry," told the petitioner that Lloyd and a few of his men had robbed him of all of his drugs and money. The petitioner and a man named "Tyrone," who was an even higher-ranking Unknown Vice Lord than the petitioner, then handed out guns to the remaining gang members and told them to look for and kill Lloyd and anyone they found with him.

¶ 17    The group left in two cars and searched for Lloyd, after which they went to the Shamrock Hotel, where the petitioner and Tyrone passed out more guns. On the following morning, they all went to the petitioner's grandmother's house, where the petitioner told them that Lloyd was trying to take over his drug spot and offered money to anyone who would help him secure it. The petitioner and Tyrone left but returned later and said that two of Lloyd's "boys" were selling drugs on the petitioner's spot. Everyone grabbed their guns and rushed to the corner at Springfield and Fillmore.

¶ 18    By the time Harvey arrived at the spot, the petitioner and Tyrone were already putting "two guys" in the back seat of their car. The petitioner instructed Harvey and about seven or eight other men to follow in another vehicle, and he complied. Once they reached the area near the viaducts

6

at Roosevelt Road and Western Avenue, everyone exited their vehicles, and the two guys were dragged to the train tracks and made to sit on a log, while the rest surrounded them. The petitioner asked the two men where Lloyd was because he and Tyrone still wanted to find and kill Lloyd. The petitioner then shot one of the teens in the head, after which everyone, including Harvey, began to shoot. According to his statement, Harvey "believe[d] [that] he shot the guy with the lighter complexion in the leg," and that the shotgun recovered from him upon his arrest was the same weapon he had used to shoot that victim. According to Harvey, after the shooting everyone returned to their cars and fled. Harvey also stated that upon his arrest, he showed the police the location of the victims' bodies.

¶ 19     Detective Kato next testified that he interrogated Harvey at approximately 9:30 p.m. on September 14, 1993. Harvey was already in custody at the police station for a weapons violation when Detective Kato approached him. Detective Kato advised Harvey of his *Miranda* rights and informed him that he was investigating the abduction of Burch and Purham. Harvey then told him that "he was present when the two victims were taken off the street, driven to another location, and then shot." The detective denied that he struck Harvey, or that he threatened to put Harvey's family's names and addresses in the newspapers if he refused to give the ASA the detective's version of events. Detective Kato also testified that Harvey showed the police where the bodies were located near 2501 West Roosevelt.

¶ 20     The State's second eyewitness, Berry Williams[5], next testified that in September 1993 he was a member of the Uknown Vice Lords and sold drugs for the petitioner at the corner of Springfield and Fillmore. Williams claimed that he knew the petitioner from the neighborhood but did not know whether the petitioner was an Unknown Vice Lord. While Williams had heard of

---

[5] At trial, Williams conceded that he had used three different aliases, had five prior felony convictions, and was currently in prison serving a six-year sentence on an unlawful use of a weapon by a felon (UUWF) charge.

Lloyd, he did not know him personally and did not know whether Lloyd was a member of the gang.

¶ 21    Williams admitted that on September 13, 1993, he was at that corner of Springfield and Fillmore with his girlfriend, Eunice Clark, waiting for "someone" to arrive to bring them drugs to sell, when he saw two black men exit a vehicle and begin selling drugs at the same spot. Williams next claimed that he subsequently left the area and did not observe anything. Williams was then confronted with his prior statements to the police and the ASAs, as well as his testimony before several grand juries.

¶ 22    Williams first identified his signature on a handwritten statement made on September 16, 1993, in the presence of ASA Nelson. While Williams admitted that his signature was on the statement, he claimed that he could not recall any of the assertions that were contained therein. Williams claimed that the reason he could not remember a lot of what transpired on September 13, 1993, was because at that time he was a heavy heroin user, spending around $700 to $800 a day on his habit. Williams averred that he was high on heroin when he was questioned by the police and that he was held in police custody until he agreed to sign a written statement and testify before the grand jury. He stated that as soon as he was released by the police, he immediately took heroin to relieve the symptoms of withdrawal, which he suffered while in custody. Williams also claimed that he had been given money by the State to relocate.

¶ 23    Williams was next asked about his prior testimony at several grand jury hearings. He acknowledged that during a 1993 grand jury hearing in one of the codefendants' cases, he testified that when the two men got out of the car at the corner of Springfield and Filmore they stated that the "spot" no longer belonged to the petitioner and instead belonged to Lloyd. He also recalled testifying that other men with guns then approached and surrounded the two men and forced them

into a vehicle. While Williams acknowledged that the petitioner was present when this occurred, he claimed that he could not recall testifying at either the 1993 or 1998 grand jury hearings that the petitioner forced the two men into the vehicle. Instead, he claimed that the petitioner was "just out there" but did not take any part in the abduction.

¶ 24    Williams also admitted that on January 14, 1998, he spoke with ASA Michael Smith and Investigator Mike DeLacey at his own residence. He claimed, however, that he could not recall telling either of them that he saw "the two kids taken off the corner" and that if he were to testify to that he would be killed.[6]

¶ 25    After Williams' recantation, the State offered the testimony of the two ASAs who had spoken to Williams. First, ASA Nelson testified that he took Williams' statement at about 5 a.m. on September 16, 1993, and that according to this statement the petitioner took part in the abduction and was armed. On cross-examination, ASA Nelson acknowledged that prior to taking this statement, he did not ask Williams whether he was a drug user or whether the police had allowed him to sleep. In addition, he acknowledged that he had previously testified that during his conversation with Williams, Williams "appear[ed] somewhat nervous."

¶ 26    ASA Smith next testified that when he spoke to Williams on January 14, 1998, at Williams' residence, Williams told him that he would be killed if he testified in the petitioner's case. According to ASA Smith, Williams stated that "they would kill him, and they would kill everybody in the building." He then added: "As a matter of fact, I'm surprised I'm not dead for testifying in the grand jury and giving a statement to the police." Williams, however, did not identify who "they" were.

---

[6] The parties, however, subsequently stipulated that Williams had previously told investigators, and testified at a prior proceeding held on September 22, 1998, that he feared for his life if he testified at the petitioner's trial.

¶ 27    ASA Smith further testified that between 1993 and 1998, the State relocated Williams for his own safety and that Williams was given approximately $1200 for that relocation. He acknowledged, however, that although he provided his contact information to Williams, after the relocation Williams never reported that he was in danger or that he was threatened.

¶ 28    The State's third eyewitness, Tyrone Hawkins[7] next testified that at about 10 p.m. on September 13, 1993, he was with Williams and Clark selling drugs near Springfield and Fillmore, a location that belonged to the petitioner, when two teenagers exited a car and started selling drugs on the same spot. When the petitioner saw the teenagers, he said "Do these shorties know where they're at? *** If they don't know they will know." The petitioner then drove away in his vehicle, and returned later with about eight or nine men, including codefendant Weatherspoon. The petitioner exited his vehicle with a large revolver and grabbed one of the young men, while codefendant Weatherspoon, who had a pistol, grabbed the other. One of the "shorties" was crying so codefendant Weatherspoon poked him with his revolver and told him to "shut the f**k up before [he] bl[e]w [his] head off." The petitioner told Weatherspoon to "cool out," because "[t]his ain't no place to take care of no business." As the two teenagers were forced into the vehicle, the petitioner told Hawkins, "This corner got blood on it," and that they were going to "max these n*****s," which Hawkins understood to mean "bodily harm *** kill, dead, whatever." The petitioner instructed Hawkins to keep his mouth shut and that if anyone asked about the teenagers to say that the police had taken them.

¶ 29    According to Hawkins, about 10 minutes later, codefendant Weatherspoon returned to the corner. Together with Williams and Clark, Hawkins got into his car, where he saw a gun on the front passenger seat. When he asked codefendant Weatherspoon about the two teenagers,

---

[7] Hawkins acknowledged that he had four prior drug-related convictions and one pending case at the time of the petitioner's second trial.

Weatherspoon told him that "they was [*sic*] up," which Hawkins understood to mean that they had been killed. Later, when Hawkins asked the petitioner about the two young men, the petitioner told him that it was none of his business. Hawkins started bothering the petitioner for money, so the petitioner asked codefendant Weatherspoon what he took from "the shorties." Weatherspoon then gave Hawkins $60 and 12 packages of cocaine, which had been taken from the two young men, while the petitioner instructed him to keep quiet about what he had seen. Williams and Clark were also given some money.

¶ 30     On cross-examination, Hawkins acknowledged that he was not arrested by the police until August 12, 1995, two years after Burch and Purham were killed. Hawkins averred that he jumped from the railroad tracks while running from the police and was badly injured during his initial interrogation. He also claimed that in 1993 and 1995 he used heroin and cocaine daily, snorting about ten bags of heroin per day, and was experiencing withdrawal symptoms while in police custody. Hawkins testified that even though he told the police that he needed medical attention for his injuries they did not take him to the hospital until he signed a statement inculpating the petitioner. Hawkins claimed that the statement was written by an ASA and that he signed it at about 2 a.m. on August 13, 1995, without reading it because the police told him to do so, and because he wanted to get to the hospital.

¶ 31     On cross-examination, Hawkins further acknowledged that in 1996, he went to speak with attorney Joan McClain-Hill, who was representing the petitioner at the time, and informed her that the statement he gave to the police was false and that the ASAs had told him what to say. Subsequently, in December 1999, Hawkins also visited the petitioner in prison of his own accord. He claimed that no one told him to go, and that the petitioner never threatened him. Hawkins told the petitioner that the statement he gave to the police was untrue and that the police told him what

to say and who to point out. Specifically, the police showed Hawkins a photograph of the petitioner and told him to say that the petitioner was involved in the kidnapping.

¶ 32    On cross-examination, Hawkins acknowledged that each morning before trial, a police officer picked him up from his home, drove him to the courthouse and brought him directly to the ASA's office. Hawkins stated that he went over his statement with the ASA five times before testifying and claimed that the ASA showed him a large chart with pictures of the petitioner and other alleged members of the Unknown Vice Lords. Hawkins further admitted that he wanted to speak with defense counsel prior to trial but that he refused to answer certain questions while the ASA was present.

¶ 33    Cook County Medical Examiner, Dr. Edmund Donoghue, next testified that he was present when Dr. Porterfield, who had since left the office, performed the autopsies on both victims. According to Dr. Donoghue, the younger victim, Burch, received nine gunshot wounds to various parts of his body, while the older victim, Purham, received two gunshot wounds—a "contact fired" shot to the right side of his head and a close-range shot to the right side of his chest. The cause of death for both victims was multiple gunshot wounds and the manner of death was homicide. Dr. Donoghue acknowledged that several medium caliber bullets were recovered during the autopsies. In addition, he acknowledged that a wound to Burch's left lower chest was larger than the other wounds and probably caused by a medium caliber bullet that deviated from its "nose-on trajectory." Dr. Donoghue further stated that it was "possible" that this wound came from a large caliber bullet, such as a "deer slug" fired from a shotgun but acknowledged that no deer slug or shotgun pellets were recovered from either body.

¶ 34    After the State rested, in his case-in-chief, the petitioner presented only one stipulation, namely that in a prior proceeding held on January 27, 2004, when questioned about whether he

had observed the petitioner with a gun, Hawkins testified that he believed the petitioner had a revolver.

¶ 35    After the parties' closing arguments, the jury found the petitioner guilty of the first-degree murders of both Burch and Purham. The circuit court subsequently sentenced the petitioner to natural life in prison.

¶ 36    On direct appeal, the petitioner argued that the circuit court erred by admitting: (1) various hearsay testimony implicating him in the murders; (2) evidence that Williams had been threatened and feared retaliation if he testified; (3) testimony regarding the shotgun recovered during Harvey's arrest; and (4) other crimes' evidence indicating that the petitioner had taken steps to murder Lloyd. The petitioner also argued that the cumulative effects of these errors deprived him of his right to a fair trial. On April 23, 2009, this appellate court affirmed the petitioner's conviction and sentence. See *People v. Thigpen*, No. 05-3087 (April 23, 2009) (unpublished order pursuant to Illinois Supreme Court Rule 23).

¶ 37    While his appeal was pending, on August 26, 2008, the petitioner filed his initial *pro se* postconviction petition. Therein, he raised 137 separate allegations of constitutional error. After his petition was automatically docketed for second-stage postconviction proceedings, on November 2, 2009, the petitioner filed an amended *pro se* petition adding another 103 claims to his original pleading. On March 11, 2018, the petitioner filed his second amended *pro se* postconviction petition. Subsequently, on three separate occasions (July 19, 2018, August 27, 2018, and April 11, 2019), he supplemented that amended petition with additional *pro se* claims and attachments. For clarity, we will refer to all of the petitioner's pleadings as one postconviction petition.

¶ 38    Relevant to this appeal, that petition alleged numerous instances of both trial and appellate

counsel's ineffectiveness, circuit court errors, and an actual innocence claim. In support, the petitioner attached over 500 pages of exhibits, including, *inter alia*: affidavits from Hawkins, Williams, Tyrone, Clark, attorney McClain, Keith Davis, Roosevelt Appling, Cherry Williams, Shannon Lovings, Houston Harris, Gennie Thigpen, Markell Hall, and himself; (2) letters from Clark to the petitioner in prison apologizing for having lied to the police and implicating him in the kidnapping and murders of the two victims; (3) Williams' death certificate noting his accidental drug-related demise on December 30, 2008; (4) police reports from the petitioner's arrest and the arrests of his codefendants; (5) transcripts from the petitioner's two trials and the trials of his codefendants; (6) briefs and appellate court orders from the petitioner's and the codefendant's appeals; (7) transcripts from his two grand jury proceedings; (8) an article with an interview of Willie Lloyd describing his rise and violent reign as the leader of the Unknown Vice Lords in Chicago during the 1990s; and (9) numerous articles, decisions, affidavits, and transcripts from other proceedings, describing and discussing the alleged torture and police brutality used by Detective Kato during his interrogation of suspects and witnesses at Area 4 Chicago police station during the 1990s.

¶ 39    For purposes of brevity, we will detail the relevant affidavits and supporting documents as we discuss each issue below. For the time being, we note that when read together, the affidavits and other supporting documents allege that the petitioner was not present during the kidnapping and shooting of Burch and Purham but was instead with his girlfriend, Lovings. They further allege that Lloyd paid Clark to lie to the police and incriminate the petitioner, and that she convinced Williams to do the same, while also falsely implicating Hawkins as a witness. The affidavits further allege that Hawkins agreed to lie for the police that the petitioner committed the kidnapping and murders only because the police threatened to charge him instead. The affidavits and supporting

14

documents also allege that Detective Kato, who was notorious for his pattern and practice of police abuse, beat and threatened codefendant Harvey into giving a false statement implicating the petitioner in the two murders, and that the police wanted to frame the petitioner for this crime, because his conviction in an unrelated case had just been reversed on direct appeal.[8]

¶ 40    On February 26, 2019, over ten years after the petitioner filed his original *pro se* petition, the State filed a motion to dismiss, arguing, *inter alia*, that the petition had failed to make a substantial showing of either trial or appellate counsels' ineffectiveness, that any allegations of trial error were barred by *res judicata* or waiver, and that the petitioner's freestanding claim of actual innocence was not based on any newly discovered evidence. The petitioner filed his response to the State's motion to dismiss on October 21, 2019. The circuit court then held a two-part second stage hearing, after which it granted the State's motion to dismiss. The petitioner now appeals.

¶ 41                          II. ANALYSIS

¶ 42    On appeal, the petitioner abandons the vast majority of the 239 issues that he raised in the circuit court. Instead, he asserts that the circuit court applied an improper standard of review in dismissing his petition and that he made a substantial showing of 14 constitutional violations,[9]

_____

[8] The petitioner was charged with and convicted of, *inter alia*, first degree murder for the shooting of Clifton Burks on September 12, 1993, and sentenced to 75 years' imprisonment. In June of 1999, however, his conviction was reversed and remanded on the basis of prejudicial other crimes evidence that has been used at trial. See *People v. Thigpen*, 306 Ill. App. 3d 29 (1999) On remand, the petitioner pleaded guilty in exchange for a 5-year sentence.

[9] These include four claims of ineffective assistance of trial counsel, six claims of ineffective assistance of appellate counsel, three trial errors and an actual innocence claim. Specifically, the petitioner asserts that his trial counsel was ineffective for failing to: (1) investigate and call numerous exculpatory witnesses; (2) investigate and impeach Detective Kato; (3) impeach the medical examiner; and (4) object to the State's closing arguments. The petitioner also contends that the circuit court erred in: (1) denying his request to represent himself during trial; (2) failing to conduct a *Krankel* hearing; and (3) admitting codefendant Harvey's police statement as substantive evidence at trial. The petitioner also argues that appellate counsel erred in not raising the following issues on direct appeal: (1) the insufficiency of the evidence offered at trial; (2) the circuit court's denial of the petitioner's motion to dismiss on the basis of his preindictment delay and Detective Kato's false and misleading grand jury testimony; (3) the circuit court's denial of the petitioner's right to self-representation and his subsequent request for a *Krankel* hearing; (4) the circuit court's denial of the petitioner's request for a continuance to obtain discovery prior to being permitted to

entitling him to a third-stage evidentiary hearing.

¶ 43    At the outset, we set forth the well-established principles regarding postconviction proceedings. The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a means by which a criminal defendant may challenge his conviction on the basis of a "substantial deprivation of federal or state constitutional rights." *People v. Tenner*, 175 Ill. 2d 372, 378 (1997); *People v. Cotto*, 2016 IL 119006, ¶ 26; *People v. Tate*, 2012 IL 11214, ¶ 8; *People v. Hodges*, 234 Ill. 2d 1, 9 (2009); *People v. Peeples*, 205 Ill. 2d 480, 509 (2002). Because a postconviction proceeding is a collateral attack on the criminal conviction, issues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised, but were not, are forfeited. *Tate*, 2012 IL 11214, ¶ 8; *People v. English*, 2013 IL 112890, ¶ 22.

¶ 44    At the second stage of postconviction proceedings, such as here, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a violation of constitutional rights. 725 ILCS 5/122-6 (West 2016); *Tate*, 2012 IL 11214, ¶ 10; *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006); see also *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). In doing so, the court must not engage in fact-finding or credibility determinations but must take as true all well-pleaded facts that are not positively rebutted by the original trial record. *People v. Domagala*, 2013 IL 11368, ¶ 35; *People v. Sanders*, 2016 IL 118123, ¶ 42; see also *People v. Towns*, 182 Ill. 2d 491, 501 (1998) ("In determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in any accompanying affidavits are taken as true."); see also *People v. Plummer*, 344 Ill. App. 3d 1016, 1020 (2003) ("The Illinois Supreme Court *** [has] recognized that factual disputes raised by the pleadings cannot be resolved by a

---

proceed *pro se*; (5) trial counsel's failure to object to Williams' testimony compounded by stipulating to "some aspects" of that testimony; and (6) the denial of the petitioner's right to "a fair and impartial trial" based on "many trial errors."

motion to dismiss at either the first stage *** or at the second stage *** [of postconviction proceedings], rather, [they] can only be resolved by an evidentiary hearing"); see also *People v. Coleman*, 183 Ill. 2d 366, 380-81 (1998) ("[O]ur past holdings have foreclosed the circuit court from engaging in any fact-finding at a dismissal hearing because all well-pleaded facts are to be taken as true at this point in the proceeding."); see also *People v. Dupree*, 2018 IL 122307, ¶ 29 ("The substantial showing of a constitutional violation that must be made at the second stage is 'a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief.' (Internal citations omitted.)").

¶ 45    To determine whether averments are positively rebutted by the record, the inquiry is whether it is clear from the trial record that no fact finder could ever accept the truth of the averments. See *People v. Robinson*, 2020 IL 123849, ¶ 60; *People v. Simms*, 2021 IL App (1st) 161067-B, ¶ 28. Contradictions between the petitioner's averments and the trial evidence are not enough, because recognizing the existence of a conflict with the trial evidence is not the same as finding that the averments are positively rebutted. See *Simms*, 2021 IL App (1st) 161067-B, ¶ 35 (citing *Robinson*, 2020 IL 123849, ¶ 60).

¶ 46    Accordingly, where no substantial showing of a constitutional violation is made, the petition is dismissed. *Tate*, 2012 IL 11214, ¶ 10. If, however, a substantial showing of a constitutional violation is set forth, the petition must be advanced to the third stage for the circuit court to conduct an evidentiary hearing. *Tate*, 2012 IL 11214, ¶ 10. Our review of the circuit court's dismissal of a postconviction petition at the second stage is *de novo*. *Tate*, 2012 IL 11214, ¶ 10; *Pendleton*, 223 Ill. 2d at 473.

¶ 47    In the present case, prior to addressing the petitioner's 14 claims, we find it prudent to

address the state of his appellate brief. In that respect, we note that as a reviewing court, we are "not simply a depository" into which the appellant "may dump the burden of argument and research," and that instead, we are " 'entitled to have the issues clearly defined with pertinent authority cited.' " *People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 205 (quoting *People v. Hood*, 210 Ill. App. 3d 743, 746 (1991)). Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) mandates that an appellant's brief contain "[a]rgument, which shall contain the contentions of the appellant and the reasons thereof, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). An appellant's failure to cite authority or to articulate an argument will result in forfeiture of that argument on appeal. *Oglesby*, 2016 IL App (1st) 141477, ¶ 205.

¶ 48    In the instant case, while the petitioner's brief provides detailed arguments with respect to his assertions of actual innocence and trial counsel's ineffectiveness based on counsel's failure to investigate and call numerous exculpatory witnesses and to investigate and impeach Detective Kato, the remainder of his claims regarding inadequate representation by trial and appellate counsels and the errors committed by the circuit court are completely undeveloped. These claims are either listed under one-sentence bullet points or articulated in short conclusory paragraphs with no citation to relevant authority and/or the supporting record. As such, the petitioner's brief fails to describe why trial counsel was ineffective for failing to impeach the testimony of the medical examiner or to object to the State's closing arguments, why any of the circuit court errors were meritorious or why appellate counsel's failure to raise the myriads of issues merely listed in the brief was either unreasonable or prejudiced the petitioner. Accordingly, because the brief fails to develop cohesive arguments with respect to any of these claims, as is required under Supreme Court Rule 341, we find that the petitioner has forfeited them for purposes of this

appeal. See Ill. S. Ct. R. 341(h)(1) (eff. Oct 1, 2020).

¶ 49    That leaves us with only three fully developed issues for review, namely: (1) trial

counsel's failure to investigate and call exculpatory witnesses; (2) trial counsel's failure to

investigate and impeach Detective Kato; and (3) the petitioner's actual innocence claim.

¶ 50                    A. Ineffective Assistance of Trial Counsel

¶ 51    We begin by addressing the petitioner's allegations regarding trial counsel's

representation. It is axiomatic that claims of ineffective assistance of counsel are governed by the

standard set forth in *Strickland v. Washington*, 466 U.S. 668, (1984); see also *People v. Lacy*, 407

Ill. App. 3d 442, 456 (2011); see also *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People*

*v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland* )). Under that two-prong test, a petitioner

must establish both: (1) that his counsel's conduct fell below an objective standard of

reasonableness under prevailing professional norms; and (2) that he was prejudiced by counsel's

conduct, *i.e.*, that but for counsel's deficient performance, there is a reasonable probability that the

result of his proceeding would have been different. See *Lacy*, 407 Ill. App. 3d at 456; see also

*People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (citing *Strickland*, 466 U.S. at 687-94); see also

*Domagala*, 2013 IL 113688, ¶ 36. Failure to establish either prong of the *Strickland* test precludes

a finding of ineffective assistance of counsel. See *People v. Henderson*, 2013 IL 114040, ¶ 11; see

also *People v. Patterson*, 217 Ill. 2d 407, 438 (2005).

¶ 52    Under the first *Strickland* prong, the petitioner must overcome the strong presumption

that the challenged action or inaction might have been the product of sound trial strategy. *Lacy*,

407 Ill. App. 3d at 456-57. Under the second *Strickland* prong, "a reasonable probability that the

result would have been different is a probability sufficient to undermine confidence in the

outcome—or put another way, that counsel's deficient performance rendered the result of [the

proceedings] unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004); see also *Plummer*, 344 Ill. App. 3d at 1019 (citing *Strickland*, 466 U.S. at 694).

¶ 53    Where, as here, we are tasked with reviewing the second-stage dismissal of a petition alleging ineffective assistance of trial counsel, we determine whether the petition has made a substantial showing under the two-prong *Strickland* ineffectiveness test. *People v. Alberts*, 383 Ill. App. 3d 377-78 (2008).

¶ 54                    1. Failure to Investigate and Call Exculpatory Witnesses

¶ 55    In the present case, the petitioner first asserts that he made a substantial showing that his defense counsel was ineffective because she failed to investigate, interview and call numerous exculpatory witnesses on his behalf and that the circuit court's findings to the contrary were based on improper credibility determinations and factual findings regarding these witnesses. For the following reasons, we agree.

¶ 56    At the outset, we note that contrary to the State's position, the record affirmatively establishes that in dismissing this claim, the circuit court: (1) failed to adequately review the petitioner's pleadings and attached documentation, incorrectly noting that the petitioner provided two alibi affidavits instead of one; (2) utilized the incorrect standard for second stage postconviction review, inappropriately pressuring postconviction counsel to provide unnecessary communications from trial counsels explaining their strategic decisions; and (3) improperly weighed the credibility of the alibi and impeachment witnesses in foreclosing an evidentiary hearing.

¶ 57    In that respect, the record reveals that during the hearing on the State's motion to dismiss, the circuit court *sua sponte* asked how many attorneys from the Office of the Public Defender represented the petitioner at trial. After the parties responded that there were four attorneys,

naming each one, the court noted that while the lead public defender Crystal Carbellos was now deceased, three of the remaining attorneys were "still around." The court then inexplicably inquired whether postconviction counsel had spoken to the "other three to ask them why they did or didn't do some of the things that you're talking about now." As the court stated, "[It] might be relevant today to know what [the petitioner's] three lawyers who *** are still around, what was going on in their minds and their strategy and why they were thinking what they were thinking and doing what they were doing."

¶ 58     Postconviction counsel responded that while interviewing these attorneys would be appropriate at a third-stage evidentiary hearing, at a second stage proceeding, such as this one, the petitioner was not required to present affidavits from his attorneys. The circuit court disagreed, clarifying that it was "not talking about the third stage," but rather about "right now, at the second stage." When postconviction counsel reiterated that he believed the postconviction petition contained sufficient evidence as it was, and asked whether the court was refusing to rule on the State's motion to dismiss until counsel reached out to the three attorneys, the court stated:

> "Here's what I'm saying: At some point, I have to hear what they have to say. You're making all kinds of aggressive claims against his lawyers and then you have affidavits supporting it, that looks very powerful. That looks very troubling, very concerning. But we've never talked to the lawyers to see what happened and the lawyers are here. They are all here. They are literally in this building, so they are available to you.
>
> So, whether I hear it today or hear it tomorrow at a third-stage hearing—and the thing with a third-stage hearing, that's a major commitment for everybody, for you and for everybody else. They may very well have something to say that's very supportive of you and that would make your claims even easier to get to a third-stage hearing. I have no

idea, but I think it behooves us to have that information available because I will have to hear it one way or the other. So[,] if we do it at the second stage or the third stage, I would much prefer to do at the second stage. And I'll give you a chance to talk to them and come back."

¶ 59    The court then clarified that it was not "ordering" counsel to do anything but then stated that because he was raising "major errors and claims" and had "done massive work on this case already," interviews of the three defense attorneys were of "great import." As the court stated: "I think you almost have your full cake baked to present it to me, but that's the thing that I don't have."

¶ 60    After postconviction counsel again repeated that he wished to state "on the record" that the court could rule on the petition without more, the court responded: "I heard that, but I want to have that one little—I would be more comfortable if I had that one little bit—I, it just makes sense and logic to have that, and that's what I choose to do." The court then continued the case for postconviction counsel to reach out to the three attorneys and find out what they had to say about the petitioner's claims.

¶ 61    When the court reconvened two months later, postconviction counsel informed the court that he had discovered that during trial the petitioner had communicated only with one of the three remaining public defenders, Valerie Panozzo. Postconviction counsel then explained that he had contacted Panozzo and that she could not be of much help because "due to the march of time" and the trial having taken place 14 years ago she had no independent recollection of what had transpired.

¶ 62    The record further reflects that after receiving this information, the circuit court dismissed the petitioner's ineffective assistance of counsel claims. In doing so, the court

commented on the numerous affidavits of witnesses attached to the petition. The court first acknowledged that the petitioner had alleged that he had an alibi for the time of the murder, but then inaccurately concluded "but it turns out the alibi witnesses are his grandmother and his girlfriend." Contrary to the court's observation, however, the grandmother's affidavit never alleged an alibi defense, nor did the petitioner ever claim that his grandmother could provide one. Instead, as shall be more fully articulated below, her affidavit merely stated that the petitioner was not at her house on the day of or the day prior to the murders.

¶ 63    Following this inaccurate description of the pleadings, the circuit court next discounted counsel's failure to investigate the petitioner's alibi claim by making an inappropriate factual finding regarding the "two" alibi witnesses. As the court stated:

"I find that the fact that these alibi witnesses obviously would have been known to [the petitioner] and certainly to his lawyer if he had told them about it.

And if he did tell them about it, I'm not sure that they—I don't have any reasons to believe it wasn't checked out. But he was represented adequately."

¶ 64    The court next questioned the motives of the remaining affiants, by suggesting that their affidavits were made out of fear or intimidation. As the court noted:

"And then you have these other affidavits some of which are talking about people— they're saying things that may have been a little bit inconsistent or somewhat inconsistent or even largely inconsistent with things that they may have said earlier.

And we're talking about a dynamic *** [where] there are street gangs in Chicago and violent people in Chicago that will go to all types of lengths to try to sabotage court proceedings and intimidate witnesses and keep witnesses off the stand and do anything they can to prevent people from just telling freely and easily what they may know about a

23

case because of all kinds of fears."

¶ 65 The court then inappropriately concluded that these credibility issues foreclosed a third stage evidentiary hearing. As the court stated:

"Just to say we have to go to a third stage hearing with all the reasons that I can see the reasons why people are maybe signing some affidavits now because the same pressures that may have existed then why people recant one day especially in a case like this.

And now we're giving additional recantations, I'm just not seeing that this is something that is requiring a third stage evidentiary hearing."

¶ 66 Had the circuit court applied the proper standard of review for second stage proceedings and accepted as true the unrebutted facts set forth in the numerous affidavits and additional supporting documentation attached to the petition (*Domagala*, 2013 IL 11368, ¶ 35; *Sanders*, 2016 IL 118123, ¶ 42), it would necessarily have found that the petitioner made a substantial showing that defense counsel's failure to investigate and/or present the named witnesses was neither strategic nor harmless to the petitioner's case.

¶ 67                                    a. Alibi Witness

¶ 68 The petition first alleged that trial counsel was ineffective because she failed to investigate and call an alibi witness. In support, the petitioner attached affidavits from himself, his girlfriend Shannon Lovings, and his December 23, 2004, *pro se* request to subpoena Lovings as a witness. In his two affidavits, the petitioner attested that he gave defense counsel Lovings' contact information and repeatedly asked her to interview and call Lovings as a witness but that counsel neither contacted nor subpoenaed her. After defense counsel failed to heed the petitioner's requests, prior to trial, he filed his own *pro se* motion to subpoena numerous

"defense witnesses," including Lovings. Lovings' affidavits, in turn, provided the petitioner with an alibi for the day of the murder. Specifically, Lovings, who was six-months pregnant at the time, attested that the petitioner spent all of September 12, and September 13, 1993, with her in her home at 1013 West 19th Street, in Broadview, Illinois. Her affidavits detail their activities throughout both days, including, *inter alia*, cooking, watching movies, and playing video games. Lovings also attested that defense counsel never spoke to her or contacted her about testifying at the petitioner's trial.

¶ 69    Taking as we must the aforementioned unrebutted and well-pleaded allegations as true, we find that the petitioner has made a substantial showing that counsel's failure to investigate and call Lovings as a defense witness fell below an objective standard of reasonableness.

¶ 70    While the State is correct that typically counsel's decisions concerning which witnesses to present are matters of trial strategy and are immune from ineffective assistance of counsel claims, such strategic decisions "may be made only after there has been a 'thorough investigation of law and facts relevant to plausible options.' " *People v. Gibson*, 244 Ill. App. 3d 700, 703-704 (1993). Accordingly, our courts have repeatedly held that trial counsel has a professional duty to conduct "reasonable investigations or to make reasonable decisions that make[] particular investigations unnecessary." *Domagala*, 2013 IL 113688, ¶ 38. This duty derives from counsel's basic function "to make the adversarial testing process work in the particular case" and includes the obligation to independently investigate any possible defenses. *Strickland*, 466 U.S. at 690. As such, our courts have previously held that an attorney's failure to investigate witnesses may constitute objectively unreasonable assistance. See *e.g*., *People v. Bolden*, 2014 IL App (1st) 123527, ¶ 38 (holding that defense counsel's failure to investigate and contact alibi witnesses constituted objectively unreasonable assistance); *People v. Brown*, 336 Ill. App. 3d 711 (2002) (same); *Hodges*, 234 Ill.

2d at 20-21 (holding that counsel's failure to investigate three witnesses who would have testified that they observed an individual take a gun from the victim's body after the defendant shot him, was objectively unreasonable, as it would have supported the defendant's theory of defense); *People v. Ramirez-Lucas*, 2017 IL App (2d) 150156, ¶ 44 (holding that the petition sufficiently alleged counsel's ineffectiveness where counsel failed to investigate three witnesses who would have corroborated the petitioner's otherwise unsupported defense).

¶ 71    The record before us does not reflect any strategic decision for counsel's failure to investigate Lovings or to call her as a witness. Accepting the unrebutted allegations in the petition and supporting documentation as true, it is clear that defense counsel was aware of Lovings as a potential witness from her communications with the petitioner and because Lovings was listed as a potential "defense witness" in the petitioner's *pro se* request to have her subpoenaed for trial. From the petitioner's and Lovings' affidavits, it is further clear that counsel never spoke to Lovings prior to trial.

¶ 72    What is more, if counsel had done so, she would have learned that Lovings could provide the petitioner with an alibi. The record does not reflect any strategic reason why, if counsel had learned this, she would have chosen not to subpoena Lovings. Lovings' alibi testimony placing the petitioner in her home on September 12 and 13, 1993, could only have aided the petitioner's case, particularly where defense counsel's sole trial strategy was to discredit the State's witnesses who placed the petitioner at the scene of the crime by showing that their statements were either coerced or invented. See *e.g., People v. Skinner*, 220 Ill. App. 3d 479, 485 (1991) (finding that trial counsel's "failure to call witnesses who would support an otherwise uncorroborated defense to be ineffective assistance of counsel").

¶ 73    The State, nonetheless, speculates that counsel must have chosen not to investigate and/or

call Lovings because she was either unaware that Lovings could provide the petitioner with an alibi, or because she knew that as the petitioner's girlfriend, Lovings' testimony would have been given little weight. The State, however, fails to appreciate that such conjecture is inappropriate at the second stage of postconviction proceedings. To the extent that the record is unclear as to whether trial counsel's decision not to investigate or call this particular exculpatory witness "was a matter of trial strategy or incompetence, [the petitioner] is entitled to a postconviction evidentiary hearing on that issue." *People v. Cabrera*, 326 Ill. App. 3d 555, 564-65 (2001); see also *People v. Johnson*, 2019 IL App (1st) 153204, ¶ 46 (finding that where the record revealed no strategic reason for trial counsel's decision, the petition had to be advanced to a third-stage evidentiary hearing because the trial court was "in a better position to review whether counsel provided effective assistance of counsel" (internal quotation marks omitted)).

¶ 74 We similarly reject the State's contention that the petitioner has failed to establish prejudice arising from counsel's conduct. Contrary to the State's position, in light of the closely balanced evidence of the petitioner's guilt, we find that there was a reasonable probability that but for counsel's failure to investigate and call Lovings as an alibi witness the outcome of his trial would have been different. The State's evidence at trial was weak. No physical evidence connected the petitioner to the crime. Of the State's three eyewitnesses, two (Harvey and Williams) recanted their statements at trial, and the third (Hawkins) was thoroughly discredited during cross-examination. Moreover, all three testified in one way or another that they were either abused, pressured, or incentivized by the police to incriminate the petitioner. Under these circumstances, had the jury been presented with evidence of the petitioner's alibi, it would have had a basis upon which to acquit. See *People v. Makiel*, 358 Ill. App. 3d 102, 109 (2005) (holding that the defendant was entitled to an evidentiary hearing on his claim that counsel was ineffective for failing to

subpoena the separately tried codefendant where questions of fact existed as to counsel's failure to investigate and whether failure to call this witness rendered his trial fundamentally unfair where the record reflected no strategic reason for counsel's failure to call the witness and questions of fact could only be resolved by consideration of matters outside of the record); see also *People v. House*, 141 Ill. 2d 323, 386 (1990) (holding that based on the closeness of the evidence, counsel's failure to conduct an investigation that would have established that the victim described someone other than the defendant at the scene, constituted ineffective assistance of counsel, which likely affected the outcome of the defendant's trial); *People v. Coleman* 267 Ill. App. 3d 895, 899 (1994) (holding that counsel's failure to interview witnesses and "pursue information in his possession," which indicated that the crime had been committed differently from what the victim had reported supported the defendant's claim of ineffective assistance of counsel).

¶ 75    Under this record, we conclude that the petitioner has made a substantial showing of counsel's ineffectiveness on the basis of counsel's failure to investigate and call Lovings.

¶ 76    For these reasons, we conclude that reversal and remand for an evidentiary hearing on this issue is necessary.

¶ 77                        b. Additional Exculpatory Witnesses

¶ 78    The petition next alleged that trial counsel was ineffective for failing to investigate and/or call numerous additional exculpatory witnesses, including Tyrone, Gennie, Cherry, Harris, Hall, Davis, Appling, and Clark, who would have supported his theory that he was not present during the commission of the crimes and explained why the State's case was built on lies.

¶ 79    In support of this position, the petitioner attached numerous documents and affidavits. In his own affidavits the petitioner attested that he provided defense counsel with contact information for all of the above-named witnesses, which he wanted interviewed and called at his

trial but that despite his repeated requests, defense counsel did neither. Again, the petitioner pointed out that after defense counsel ignored his requests on December 23, 2004, he filed a *pro se* request to subpoena these witnesses.

¶ 80    The affidavits of each witness were attached to the petition and in one way or another contradicted the testimony of the State's witnesses. In summary, the petitioner's grandmother, Gennie, attested that the petitioner was not in her home on the night prior to the shooting. Tyrone attested that the petitioner was never under his leadership or sold drugs for him, that the petitioner was not with him on September 12, or 13, 1993, and that he never saw the petitioner abduct or murder anyone. Davis, Hall and Harris also attested that they were not with the petitioner on those dates.

¶ 81    Williams' sister, Cherry, corroborated Williams' trial recantation and his drug habit. She attested that Williams told her that he never sold drugs for the petitioner nor witnessed the kidnapping and murder of the two victims, and that he had lied to the police when he said that he was afraid to testify against the petitioner because he wanted the State to give him relocation money so that he could buy drugs.

¶ 82    Similarly, Appling corroborated Hawkins' admission on cross-examination that the statement he made to the police was false and made under duress. Appling attested that when he spoke to Hawkins in December 1996, Hawkins told him that the police had shown him "pictures of two guys and of the petitioner" and instructed him to say that the petitioner had kidnapped and murdered them, threatening him that if he refused, they would charge him for the crimes instead. Hawkins also told Appling that he was so afraid that he would have "lied on Jesus Christ if he had to" because he did not want to spend the rest of his life in prison or end up on death row.

¶ 83    Both Cherry and Williams also suggested that Clark, paid by Lloyd, had framed the

petitioner for the crimes. Cherry attested that Williams told her that Clark had given him $3,000 to lie and implicate the petitioner in the murders. Similarly, Appling attested that Hawkins told him that Clark had offered him money to falsely implicate the petitioner but that he refused. According to Appling, Hawkins told him that Clark was given $15,000 by Lloyd to lie that she and Hawkins had seen the petitioner kidnap and murder the "two boys." Lloyd had also encouraged Clark to spread this rumor throughout the neighborhood. According to Clark, Lloyd was always "playing these games" and paid people to lie that they had witnessed things that they had not because he knew that the police and the ASAs did not care.

¶ 84    In addition, Clark herself admitted that she lied to the police about seeing the kidnapping and murder and that the police knew she was lying when she implicated the petitioner. Specifically, in her affidavit made in support of codefendant Weatherspoon, Clark attested that she did not see any murder or kidnapping and that she lied because she wanted to get "some money" from the State so that "they would not lose their case." In addition, in a notarized transcript from an interview Clark gave to attorney Frederick Cohn in November 1999, Clark claimed that the State offered her money to testify against, *inter alia*, the petitioner and told her that while the money would be called "relocation" money, she did not need to move anywhere and could instead use a friend's address and simply cash the checks. Clark also stated that ASA Micheal Smith on the 13th floor of the Gang Unit showed her a photograph of the petitioner, told her his name, and instructed her to implicate him in the kidnapping and murders, even though he knew that the petitioner was not involved. The ASA told Clark that he "had" the petitioner on another murder but wanted to "stick him" with this one because he knew that the petitioner "had something to do with it because those w[ere] his guys."

¶ 85    All of the witnesses attested that they were willing to testify but were never contacted by

defense counsel prior to the petitioner's trial.

¶ 86    On appeal, the State asserts that trial counsel's failure to investigate and/or call any of these witnesses was strategic and therefore did not constitute ineffective representation.

¶ 87    At the outset, we note that from the record it is unclear who Davis, Hall, and Harris are, how they are related to the instant matter, or how their testimony could have helped the petitioner's case. None of these individuals testified at the petitioner's trial. While the testimony of the State's three witnesses established that the abduction of the two victims was accomplished by a group of about ten men, who were identified by their nicknames, the petitioner nowhere alleged that Davis, Hall, or Harris, were among those present or that they were known under the nicknames mentioned at trial. Accordingly, he has failed to make a substantial showing of counsel's infectiveness for failing to investigate and/or call these three witnesses.

¶ 88    However, turning to the remaining five exculpatory witnesses (Tyrone, Gennie, Cherry, Appling and Clark), we note that our courts have previously held that "the failure to call a witness who would contradict the State's evidence and support the defense reflects deficient performance." *People v. Willingham*, 2020 IL App (1st) 162250, ¶ 48; see also *People v. Butcher*, 240 Ill. App. 3d 507, 510 (1992) (finding that trial counsel's failure to call two witnesses that would "corroborate and buttress" the defendant's testimony was not a reasonable trial strategy); *Skinner*, 220 Ill. App. 3d at 485 (holding that counsel's "failure to call witnesses who would support an otherwise uncorroborated defense to be ineffective assistance of counsel"). Moreover, as already noted above, "[w]hen the record is unclear concerning whether trial counsel's decision not to call exculpatory witnesses was a matter of trial strategy or incompetence, [the petitioner] is entitled to a postconviction evidentiary hearing on that issue." *Cabrera*, 326 Ill. App. 3d at 564-65; see also

31

*Johnson*, 2019 IL App (1st) 153204, ¶ 46.

¶ 89 In the present case, taking as we must the petitioner's unrebutted and well-pleaded allegations as true, we must accept that defense counsel did not call witnesses who claimed to support the petitioner's position that he was not present during the planning or the abduction and murder of the two victims, and that any statements made to the contrary were either made under duress or were invented by Clark, who was being paid by Lloyd to falsely implicate the petitioner, with the knowledge of the police. What is more, contrary to the Sate's position, the record does not reflect any rationale for counsel's failure to call these exculpatory witnesses. While there may be a tactical explanation for this decision, this question is necessarily best resolved at an evidentiary hearing. *Id.*

¶ 90 The State asserts that even if counsel was ineffective for failing to investigate and present these exculpatory witnesses, the petitioner has failed to make a substantial showing of prejudice, thereby precluding any possibility of a third-stage evidentiary hearing. We disagree.

¶ 91 As already noted above, the State's evidence at trial was weak. There was no physical evidence linking the petitioner to the crime. Instead, after Harvey's and Williams' trial recantations, the State was left solely with Hawkins' discredited account. As such, testimony from witnesses establishing that the petitioner never worked for Tyrone, was not present either during the planning or the subsequent abduction and murder of the victims, and corroborating Williams' recantation and defense counsel's position that Hawkins was testifying under duress and/or pressure from the police, could only have aided the petitioner's case. Moreover, offering evidence of Clark's involvement in falsely incriminating the petitioner for Lloyd would have further strengthened the petitioner's position that he was being framed for the crime. Accordingly, under this record, we are compelled to conclude that there was a reasonable probability that but for

counsel's failure to investigate and call witnesses, who would have cast doubt on the State's case, the outcome of the petitioner's trial would have been different. *Strickland*, 466 U.S. at 694. We therefore conclude that the circuit court erred in dismissing this claim.

¶ 92          2.  Investigation and Impeachment of Detective Kato

¶ 93    On appeal, the petitioner next asserts that he made a substantial showing of trial counsel's ineffectiveness for failing to investigate and impeach Detective Kato with a wealth of available evidence documenting his pattern and practice of coercing statements from suspects and witnesses. In support, the petitioner relies, *inter alia*, on over a dozen newspaper articles, and numerous Illinois decisions published prior to his trial, detailing the allegations of the detective's pattern and practice of misconduct in other cases.[10] The petitioner asserts that because, at trial, codefendant Harvey explicitly testified that the handwritten statement he gave to the police, implicating the petitioner, was false and made only after Detective Kato struck him and threatened to put his family's names in the newspaper, counsel's failure to investigate and impeach Detective Kato with this readily available information was objectively unreasonable and prejudiced the outcome of his trial. The petitioner asserts that this is particularly true where the State introduced Harvey's

---

[10] These include, *inter alia*: (1) a December 3, 1991 Reader article describing Detective Kato's rise as a brutal enforcer within the Chicago Police Department and detailed the allegations of his abuse of suspects and victims alike; (2) a February 4, 1993, Chicago Tribune article regarding Detective Kato and the numerous and repeated allegations of abuse of suspects by him; (3) a July 14, 1991 Chicago Tribune article about police brutality, noting allegations that Detective Kato obtains confessions through "intimidation and *** beatings"; (4) a March 18, 1993, Daily Law Bulletin article describing how Detective Kato obtained an involuntary confession for Micheal Wasilewski by striking and kicking him and forcing him to stay awake for 24 hours; (5) a December 18, 2001 Chicago Tribune Article describing how Detective Kato refused to let 14-year-old suspect Ezekiel McDaniel call his mother, after which he slapped him on the face and placed a gun on the table with the barrel facing the juvenile, in order to force him to sign a confession; (6) an April 8, 2002, Chicago Defender Article, describing how Detective Kato beat Mendell Gordon "until he agreed to sign a confession in fear for his life."; (7) a printout of complaints against Detective Kato from 1988 through 1999; (8) a printout of complaints filed against Detective Kato between 2001 and 2005; (9) an August 21, 1990, memo from the State's Attorney's Office to the Office of the Public Defender summarizing the statements of defense witnesses in the Kevin Murray case all of whom alleged that Detective Kato beat them (struck them in the face, kicked them in the stomach, punched them with a fist, or ripped their fingers to the ligament) until they were willing to accuse Murray of the crime; (10) an October 19, 2003, sworn declaration of Andre Wallace alleging that Detective Kato slapped him with the back of his hand in the mouth, and kicked him hard in the knee until he gave a false confessed.

handwritten statement as substantive evidence to impeach his repudiation of its contents. He claims that had counsel investigated Detective Kato and uncovered evidence of the detective's pattern and practice of misconduct, that statement would have carried far less weight. For the following reasons, we agree.

¶ 94    At the outset, we reject the State's position that the petitioner has forfeited this issue by failing to raise it in his *pro se* postconviction petition. See 725 ILCS 5/122-3 (West 2018) ("[a]ny claim of substantial denial of constitutional rights not made in the original or an amended petition is waived"); *People v. Johnson*, 352 Ill. App. 3d 442, 449 (2004) ("any issue to be reviewed on appeal must be presented in the petition filed in the trial court."). As the State itself concedes, the *pro se* petition explicitly alleged that "trial counsel was ineffective for failing to call and investigate witnesses who would testify to Det[ective] Kato has history [*sic*] and pattern of abuse and coerce statements," and attached numerous articles, documents, and decisions in support of this contention. On several other occasions, the *pro se* petition argued that this error by counsel was a violation of the petitioner's Sixth Amendment right, which must be analyzed under *Strickland*, and pointed the court to two specific cases where there were judicial findings of the detective's misconduct. In addition, the *pro se* petition repeatedly challenged counsel's failure to effectively challenge codefendant Harvey's handwritten statement to the police.

¶ 95    It is axiomatic that in reviewing "an order dismissing a postconviction petition at the second stage" we are tasked with determining "whether the allegations in the petition, *liberally* construed in favor of the petitioner, and taken as true, are sufficient to invoke relief under the Act." (Emphasis added.) *Sanders*, 2016 IL 118123, ¶ 31. "Since there are no factual issues at the dismissal stage of the proceedings, the question is essentially a legal one, which requires the reviewing court to make its own independent assessment of the allegations of the petition and

supporting documentation." *Id*.

¶ 96    Here, there can be no doubt that liberally construed, the petition can be read as presenting a challenge to counsel's ineffectiveness based upon counsel's failure to investigate and impeach Detective Kato with evidence of his pattern and practice of misconduct. The State's interpretation of the petitioner's pleadings to the contrary would be inconsistent with the requirement that *pro se* petitions be given liberal construction. See *People v. Edwards*, 187 Ill. 2d 239, 244 (2001).

¶ 97    Accordingly, we turn to the merits of the petitioner's claim. As already noted above, counsel has a duty "both legal and ethical to explore and investigate a client's case." *Makiel*, 358 Ill. App. 3d 102, 107 (2005); see also *Domagala*, 2013 IL 113688, ¶ 38 (explaining that counsel's duty to conduct reasonable investigations "includes the obligation to independently investigate any possible defenses"). Where counsel fails to fulfill this obligation, his representation may be construed as deficient. *Id*.

¶ 98    In the present case, as is apparent from the numerous articles, decisions and other supporting documents attached to the petition, at the time of the petitioner's trial in 2005, there was a wealth of information regarding allegations of Detective Kato's alleged misconduct, such that even a minimal search of the detective would have substantiated his pattern and practice of coercion so as to corroborate codefendant Harvey's testimony that his handwritten statement to police was a product of police coercion. See *e.g*., *People v. Wright*, 2013 IL App (1st) 103052-U, ¶ 38 (noting that a "quick internet search uncovered" a Reader article from 1991, and the following cases, *People v. McDaniel*, 326 Ill. App. 3d 771, 777-78 (2001); *People v. West*, 236 Ill. App. 3d 1041, 1046 (1994), *People v. Prince*, 288 Ill. App. 3d 265, 271 (1997); *People v. Murray*, 254 Ill. App. 3d 538, 543-44 (1993); *People v. Shelton*, 264 Ill. App. 3d 763, 766 (1993); *Seaton v. Kato*, No. 94 C 5691, 1995 WL 88956 (N.C. Ill. 1995*); Waslewski v. Kato*, No. 92 C 6940, 1993 WL

8761 (N.D.Ill.1993); *Steward v. Summerville*, No. 90 C 6956, 1992 WL 300986 (N.D.Ill 1992), all of which detailed evidence of the pattern and practice of Detective Kato, which involved "beatings of suspects" to obtain confessions and "perjury by Kato and his partners at trial about the means used to obtain" them).

¶ 99    Because this information was so readily available, counsel's failure to investigate and uncover it alone constitutes ineffective assistance of counsel. Moreover, contrary to the State's position, we see no strategic reason why once uncovered counsel would have chosen not to use it. Evidence of Detective Kato's pattern and practice of misconduct could only have aided the petitioner's case, by impeaching Detective Kato's testimony that he never struck or threatened Harvey and supporting Harvey's claim that the statement, subsequently introduced at the petitioner's trial, was a product of police coercion. See *e.g.*, *People v. Johnson*, 2024 IL App (1st) 220419 (holding that trial counsel as ineffective for failing to investigate and present evidence of a pattern and practice of police misconduct).

¶ 100   What is more, in light of the already discussed closely balanced evidence of guilt offered by the State, we find that counsel's failure to investigate, uncover and utilize this information prejudiced the outcome of the petitioner's trial. *Strickland*, 466 U.S. at 694.

¶ 101   Accordingly, we find that dismissal of this claim was improper and that it should be remanded for further third stage proceedings.

¶ 102                              B. Actual Innocence Claim

¶ 103   Turning to the petitioner's actual innocence claim, we begin by noting that to establish such a claim the supporting evidence offered by the petitioner must be: (1) newly discovered; (2) material and not cumulative; and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47; *People v. Sanders*, 2016 IL 118123,

36

¶ 24 (citing *People v. Edwards,* 2012 IL 111711, ¶ 32). Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. *Robinson*, 2020 IL 123849, ¶ 47; *People v. Coleman*, 2013 IL 113307, ¶ 96. Evidence is material if it is relevant and probative of the petitioner's innocence. *Id*. Noncumulative evidence adds to the information that the fact finder heard at trial. *Id*. Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would lead to a different result. *Id*. The conclusive character of the new evidence is the most important element of an actual innocence claim. *Id*.

¶ 104   In the present case, on appeal, the petitioner argues that he made a substantial showing of a freestanding claim of actual innocence because the numerous witness affidavits attached to his petition, establish that he was nowhere near the crime scene at the time of the abduction and murders. In particular, the petitioner points to Lovings' alibi affidavit, and the new recantation affidavits made by Hawkins and Williams after his trial. In addition, the petitioner relies on the multitude of documents, decisions, and articles establishing a pattern and practice of Detective Kato's misconduct, as well as affidavits, and transcripts from interviews of individuals alleging abuse by the officer, several of which became available after his trial and direct appeal.[11]

¶ 105   In response, the State initially asserts that because the petitioner relies on the same evidence to support both his actual innocence, and his ineffective assistance of trial counsel claims he has not presented a freestanding claim of actual innocence. Moreover, the State argues that even if the petitioner was permitted to use the same evidence for both claims, the offered evidence was neither

---

[11] These include, *inter alia*: (1) a July 8, 2015, Chicago Tribune Article regarding a federal lawsuit filed by Carl Chatman who was wrongfully convicted of sexual assault in Cook County and spent over 13 years in prison, after he falsely confessed to the crime as a result of physical abuse by Detective Kato; (2) a February 1, 2010, affidavit from Patrick Prince alleging that Detective Kato hit and kicked him until he confessed; (3) a March 27, 2010 affidavit from Harold Lucas Jr. alleging that Detective Kato punched him under the chin and in the stomach and kicked him in the groin about five times until he confessed.

material, nor of such a conclusive character that it would probably change the result on retrial. For the following reasons, we disagree with the State.

¶ 106   We begin by addressing the parties' dispute over whether the petitioner may utilize the same evidence in support of both his actual innocence claim and his grievances regarding trial counsel's representation.  In this respect, the State relies on our supreme court's decision in *People v. Hobley*, 182 Ill. 2d 404, 443-33 (1998), which held that a freestanding claim of actual innocence exists only where the newly discovered evidence relied on is not also used to supplement a constitutional trial error claim. *Id.* (citing *People v. Washington*, 171 Ill. 2d 475, 479 (1996)). The petitioner, on the other hand, cites to the appellate court decision in *People v. Martinez*, 2021 IL App (1st) 190490, which held that *Hobley* identified "no principle or purpose that would be furthered by prohibiting a defendant from using the same evidence to assert both a constitutional claim of trial error and an actual innocence claim," and that instead under our supreme court's more recent pronouncement in *Coleman*, 2013 IL 113307, the Act contemplates only that "the claims be independent, not that the actual innocence claim be independent *of the evidence* underlying [the petitioner's] other constitutional claim[s] of trial error." (Emphasis in original). *Martinez*, 2021 IL App (1st) 190490, ¶¶  102, 104.

¶ 107   While this appeal was pending, in *People v. Flournoy*, 2024 IL 129353, our supreme court recently addressed this very issue and held that while "a petitioner can use the same evidence to plead both a 'free-standing' claim of actual innocence and a claim of constitutional trial error," ultimately "if the evidence establishes a claim of constitutional trial error, it will not establish a 'free standing' claim of actual innocence." *Id.* ¶ 68. In coming to this conclusion, our supreme court reasoned that a freestanding claim of actual innocence is "fundamentally different" from any possible claims of constitutional trial error. *Id.* ¶ 71 (citing *Washington*, 171 Ill. 2d at 487). The

court explained that while a trial error claim necessarily rests on the assumption that the evidence was available to the parties at the time of trial, such that either the petitioner's trial counsel or the State had a constitutional obligation to produce it, in contrast, an actual innocence claim rests on the "opposite assumption," *i.e.* that the evidence was new and unavailable to the parties at the time of trial. *Id.* ¶ 72 (citing *Washington*, 171 Ill. 2d at 479). The court therefore held "[i]f certain evidence establishes a 'free standing' claim of actual innocence, that same evidence cannot also establish a claim of constitutional trial error because evidence cannot be both 'new' and not 'new' at the same time." *Id.* ¶ 73. Accordingly, to the extent that *Martinez* suggested otherwise, our supreme court explicitly overruled that decision. *Id.*

¶ 108  Applying *Flournoy* to the present case, we find that while the petitioner was permitted to use the same evidence to plead both his actual innocence and ineffective assistance of trial counsel claims, in the end the evidence can support only one of those claims. *Flournoy*, 2024 IL 129353, ¶ 68. "If the evidence is 'new' *** then by definition, it did not exist or could not have been discovered at the time of trial" and therefore can only support the petitioner's actual innocence claim but not his claims of ineffective assistance of trial counsel. *Id.* ¶ 73. Conversely, if the evidence is not "new" it can only support the petitioner's claims regarding trial counsel's representation but not his actual innocence claim. *Id.*

¶ 109  As such, to determine whether the petitioner has made a substantial showing of actual innocence in this case, we must first decide whether the evidence he relies on in support of that claim is "new" or was instead discoverable prior to trial through the exercise of due diligence. *Id.*; see also *Robinson*, 2020 IL 123849, ¶ 47

¶ 110  To the extent that the evidence was available to the petitioner prior to trial or could have been discovered by him or his trial counsel through due diligence, we agree with the State that the

evidence was not "new" and therefore does not support the petitioner's actual innocence claim. This applies to Lovings' alibi testimony and the countless evidence of Detective Kato's pattern and practice of misconduct, which were published and/or available prior to February 2005. Both were either known to the petitioner prior to trial or could have been discovered by his trial counsel through the exercise of due diligence.

¶ 111    This leaves Williams' and Hawkins' new recantations and the evidence of Detective Kato's pattern and practice of misconduct that has arisen in the nine years since the petitioner's trial. Contrary to the State's position, all three pieces of evidence are "new" and therefore support the petitioner's actual innocence claim. While Williams and Hawkins were both available and did testify at the petitioner's trial, their subsequent and new recantations are "new" evidence, as the petitioner could not have obtained them with the exercise of due diligence. See *e.g.*, *People v. Wideman*, 2016 IL App (1st) 123092, ¶ 53 (a recantation of trial testimony may be considered new evidence, even though a petitioner may know that the witness is perjuring himself, where the petitioner did not have evidence available at the time of trial to demonstrate the witness was lying); *People v. Ayala*, 2022 IL App (1st) 192484, 137 (holding that "defendants' allegations of State coercion and affiant's averments of fear of State retaliation are sufficient to deem witnesses *** unavailable to testify at trial"); *People v. Harper*, 2013 IL App (1st) 102181, ¶ 42 (holding that where a witness attested that his trial testimony was a lie and that police officers threatened him to obtain the testimony, the affidavit was newly discovered because, "clearly, due diligence could not have compelled [the witness] to testify truthfully at the first trial.").

¶ 112    The State nonetheless asserts that even if this evidence is "new" the petitioner has failed to make a substantial showing of actual innocence because the evidence was neither material nor of such conclusive character that it would probably change the result on retrial. We disagree.

40

¶ 113   All three pieces of evidence relied on by the petitioner are relevant and probative of the petitioner's innocence since they directly attack the credibility of the State's witnesses placing the petitioner at the crime scene. *Coelman*, 2013 IL 113307, ¶ 96. Moreover, none are cumulative of evidence already presented at trial, as each "adds to the information that was before the jury and raises additional question's concerning the jury's verdict." *People v. Woods*, 2020 IL App (1st) 163031, ¶ 51.

¶ 114   For example, evidence of Detective Kato's pattern and practice of misconduct, none of which was ever introduced at trial, clearly corroborates codefendant Harvey's claim that his statement was made as a result of police coercion. Additionally, Williams' new recantation affidavit disavows any trial or prior grand jury statements implicating the petitioner. Specifically, Williams now attested that he was not at the corner of Springfield and Fillmore on September 13, 1993, but rather at home. Williams also claimed that on the following morning, his girlfriend, Clark came to his home, informed him that she had told the police that the two of them had witnessed a kidnapping and instructed him on what to say when questioned. Williams averred that when the police subsequently interrogated him, he "stuck to" Clark's story. Williams acknowledged that the police gave him relocation money but claimed that he used it to buy drugs instead of finding a new apartment. Williams also attested that he later lied in front of the grand jury and knowingly perjured himself.

¶ 115   Furthermore, Hawkins' new affidavit completely recants his trial testimony implicating the petitioner in the crimes. In his affidavit, Hawkins attested that he was willing to testify that on September 13, 1993, he was at home all day and therefore did not witness any kidnapping or murder. Hawkins also claimed that in October 1993, Clark offered him money from "some guys she knew" to lie that he had witnessed the abduction and murders. Clark had already been paid by

the same people and had lied to the police about what she had seen indicating that Hawkins had been with her at the time. While Hawkins declined Clark's offer and kicked her out, he later signed a false statement at the police station implicating the petitioner because the police threatened to charge him for the crimes instead. Hawkins attested that he was "terrified" and therefore agreed to say whatever the police wanted him to say.

¶ 116    Contrary to the State's assertion, these affidavits together with the substantial evidence of Detective Kato's pattern and practice of misconduct, which has come to light since the petitioner's trial and direct appeal, are also of a conclusive character, so as to require remand to a third-stage evidentiary hearing on the petitioner's actual innocence claim. As noted above, evidence is of a conclusive character when, considered along with the trial evidence, it would probably lead to a different result. *Coleman*, 2013 IL 113307, ¶ 96. The new evidence need not be completely dispositive. *Id.* Rather, "probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.* ¶ 97. Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Id.*; *Robinson*, 2020 IL 123894, ¶ 97. Taken together, the newly discovered, material, noncumulative evidence described above easily meets this standard. As previously discussed, there was no physical evidence linking the petitioner to the crimes, and of the State's three eyewitnesses, two recanted their statements implicating the petitioner at trial. The third and only witness to testify regarding the petitioner's involvement, Hawkins, has now provided a full recantation of his trial testimony. What is more, evidence of a pattern and practice of misconduct involving the lead detective investigating the case has come to light, supporting Harvey's claim that his statement to the police, introduced as substantive evidence at trial, was a result of police coercion. Under this

record, it is probable that when considered along with the trial evidence, this newly discovered evidence would lead to a different result. The petitioner is therefore entitled to an evidentiary hearing on his actual innocence claim.

¶ 117                                     IV. CONCLUSION

¶ 118   For the aforementioned reasons, we find that the petitioner made a substantial showing of ineffective assistance of trial counsel for failing: (1) to investigate and call alibi and other exculpatory witnesses, and (2) to investigate and impeach Detective Kato with evidence of his pattern and practice of misconduct. We also find that the petitioner has made a substantial showing of actual innocence. Because the dismissal of these claims was improper, we reverse the circuit court's order dismissing them and remand for further proceedings under the Act.

¶ 119   We further find that the petitioner has failed to make a substantial showing of any of his remaining claims of constitutional error and affirm their dismissal.

¶ 120   Affirmed in part; reversed and remanded in part.